MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
– and –
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

*Attorneys for the Non-Insider Defendants*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **SEARS HOLDINGS CORP.,** *et al.*, | Case No. 18-23538 (RDD) |
| Debtors. | (Jointly Administered) |
| *Sears Holdings Corporation*, et al. | |
| Plaintiffs, | |
| vs. | Adv. Pro. 20-07007 (RDD) |
| *Andrew H. Tisch*, et al., | |
| Defendants. | |

**REPLY IN SUPPORT OF THE**
**NON-INSIDER DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

I.    Lands' End Transfers ........................................................................................... 1

A.    The Lands' End Transfers Were "Qualifying Transfers" under
Section 546(e) ........................................................................................ 2

B.    Sears Holdings was a Qualifying Entity ................................................. 6

1.    The Separation and Distribution Agreement is Properly Before
the Court.......................................................................................... 6

2.    The Addition of a Second Agent Does Not Diminish Trust
Company's Agency.......................................................................... 7

C.    Avoidance of the Lands' End Transfers is Barred by the Statute of
Limitations ............................................................................................. 9

1.    The Seven-Year Statute of Limitations under the Puerto Rico's
Internal Revenue Code of 2011 ("Puerto Rico IRC") is Irrelevant ......... 10

2.    The Federal Debt Collection Procedures Act ("FDCPA") is Not
"Applicable Law" under Section 544(b) of the Bankruptcy Code .......... 10

3.    Even if the FDCPA is "Applicable Law" under Section 544(b) of
the Bankruptcy Code, the Pension Benefit Guaranty Corporation
("PBGC") and the Occupational Safety and Health Administration
("OSHA") Do Not Qualify as Triggering Creditors ............................. 12

II.    Seritage Transfers ........................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adler, Coleman Clearing Corp.,*
218 B.R. 13 (Bankr. S.D.N.Y. 1998) ......................................................................4

*In re Allou Distribs., Inc.,*
392 B.R. 24 (Bankr. E.D.N.Y. 2008) ....................................................................12

*Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.,*
500 B.R. 464 (W.D. Tex. 2013) .............................................................................5

*In re Bernard L. Madoff Inv. Sec. LLC,*
773 F. 3d 411 (2d Cir. 2014) .............................................................................4, 5

*Board of Governors of the Federal Reserve v. MCorp Financial, Inc.,*
502 U.S. 32 (1991) .................................................................................................4

*Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42 (2d Cir. 1991) ....................................................................................6

*In re Coudert Bros. LLP,*
673 F.3d 180 (2d Cir. 2012) ................................................................................10

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,*
651 F. 3d 329 (2d Cir. 2011) .................................................................................2

*Erie R.R. Co. v. Tompkins,*
304 U.S. 64 (1938) .............................................................................................9, 10

*In re Gawker Media LLC,*
571 B.R. 612 (Bankr. S.D.N.Y. 2017) .................................................................10

*In re Global Crossing, Ltd.,*
385 B.R. 52 (Bankr. S.D.N.Y. 2008) .....................................................................2

*Global Network Commc'ns, Inc. v. City of New York,*
458 F.3d 150 (2d Cir. 2006) ..................................................................................6

*Grede v. FCStone, LLC,*
746 F.3d 244 (7th Cir. 2014) .................................................................................3

*In re Hechinger Inv. Co.,*
274 B.R. 71 (D. Del. 2002) ....................................................................................8

*Holywell Corp. v. Smith*,
    503 U.S. 47 (1992) ................................................................................................4

*In re Integra Realty Res., Inc.*,
    198 B.R. 352 (Bankr. D. Colo. 1996), *aff'd*, 354 F.3d 1246 (10th Cir. 2004) ........................2

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991) ....................................................................................6

*MC Asset Recovery, LLC v. S. Co.*,
    2008 WL 8832805 (N.D. Ga. July 7, 2008) ..........................................................11, 12

*Merit Mgmt. LP v. FTI Consulting, Inc.*,
    138 S. Ct. 883 (2018) ..........................................................................................4, 5

*In re Mirant Corp.*,
    675 F.3d 530 (5th Cir. 2012) ..................................................................................11

*New York v. Mountain Tobacco Co.*,
    942 F.3d 536 (2d Cir. 2019) ...................................................................................12

*In re Nine West LBO Sec. Litig.*,
    482 F. Supp. 3d 187, 197-98 (S.D.N.Y. 2020) ......................................................5, 9

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    No. 12-mc-115 (JSR), 2013 U.S. Dist. LEXIS 56042 ............................................3, 5

*In re SunEdison, Inc.*,
    620 B.R. 505 (Bankr. S.D.N.Y. 2020) ......................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..............................................................................................6

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    946 F.3d 66 (2d Cir. 2019) ....................................................................................3, 4

*In re Tronox Inc.*,
    503 B.R. 239 (Bankr. S.D.N.Y. 2013) ....................................................................12

*Zurich Gen. Acc. & Liab. Ins. Co. v. Watson Elevator Co.*,
    253 N.Y. 404 (1930) ..............................................................................................8

**Statutes**

6 Del. C. § 1301(3), (4) ...............................................................................................13

6 Del. C. § 1307 ........................................................................................................13

13 L.P.R.A. § 30621(a)(1) ...........................................................................................10

11 U.S.C. § 101(22)(A)..............................................................................1, 7, 8

11 U.S.C. § 546(e) ........................................................................... *passim*

28 U.S.C. § 3002(3)(B) ...........................................................................13

28 U.S.C. § 3003(c) ................................................................................11

28 U.S.C. § 3304 ....................................................................................13

28 U.S.C. § 3306(b)(2) ...........................................................................10

11 U.S.C. § 544(b) ......................................................................10, 11, 12

Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq*..........................................10, 11

Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq*. ......................................................14

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. ..............................................4

Securities Investors Protection Act, 15 U.S.C. § 78aaa *et seq*......................................4

**Other Authorities**

Fed. R. Civ. P. 12 ....................................................................................6

136 Cong. Rec. H13288 (daily ed. Oct. 27, 1990)
    (Statement of Rep. Jack Brooks) ........................................................11

2A N.Y. Jur. 2D Agency § 174................................................................8

Pub. L. 95-598, 92 Stat. 2549 (1978)......................................................11

The Non-Insider Defendants submit this reply memorandum (the "Reply") in support of the *Non-Insider Defendants' Motion to Dismiss the Complaint* ("Motion") (Dkt. No. 39) and in response to the *Plaintiffs' Omnibus Response to Motions to Dismiss* (Dkt. No. 94) ("Pls.' Br."). The Reply adopts abbreviations defined in the *Memorandum of Law in Support of the Non-Insider Defendants' Motion to Dismiss the Complaint* ("Opening Brief" or "Defs.' Br.") (Dkt. No. 40).

In late 2020, the Non-Insider Defendants were swept into a controversy involving two transactions, one in 2014, and the other the following year. They have moved to dismiss all claims against them. This Reply addresses the main points in Plaintiffs' opposition.

## I.    Lands' End Transfers.

The Lands' End transfers were safe-harbored by 11 U.S.C. § 546(e). Sears Holdings was a qualifying *entity* – as customer of its agent Computershare Trust, N.A. (the "Trust Company"), *see* 11 U.S.C. § 101(22)(A), and it made qualifying *transfers* – that is, transfers "in connection with a securities contract." Plaintiffs respond in four ways. They say first that the Lands' End transfers were dividends, and that dividends cannot be qualifying transfers – indeed cannot be safe-harbored at all under section 546(e). They then try to limit the broad reach of the statute's "in connection with" phrase. Turning to Sears' Holdings's status as a qualifying entity, they say it is "premature" to consider the agency question, because of what they left unsaid in the Complaint. On the merits, they advance a "double agent" argument. Relying on a contract submitted by affidavit, they argue that the record leaves unclear what the Trust Company did, and what its affiliate may have done. We show below that none of these approaches has merit.

### A.    The Lands' End Transfers Were "Qualifying Transfers" under Section 546(e).

Plaintiffs begin with a broadside: section 546(e) cannot protect transfers that are dividends.[1]   Whether a simultaneous exchange occurs may bear on whether a transfer is a *settlement payment*, *see Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F. 3d 329, 337 (2d Cir. 2011) (the definition of a settlement payment in the securities industry contemplates "an exchange of money or securities"), but Movants have not relied, in the motion, on a settlement payment theory.[2]   Plaintiffs have cited only two cases – both of them settlement payment decisions that do not address the securities contract clause.   *See In re Global Crossing, Ltd.*, 385 B.R. 52, 56 n. 1 (Bankr. S.D.N.Y. 2008) (responding to defendant-transferee's argument that a dividend was a settlement payment); *In re Integra Realty Res., Inc.*, 198 B.R. 352 (Bankr. D. Colo. 1996), *aff'd*, 354 F.3d 1246 (10th Cir. 2004) (debtor's prepetition transfer of former subsidiary's shares to its shareholders via spin-off was not a settlement payment).   They cite no authority, and the Non-

---

[1]    Pls.' Br. at 14-15.

[2]    This case involved far more than a mere dividend.  Although Movants have not relied on the settlement payment defense at the pleading stage in the case, the alleged transferees *effectively* paid for the Lands' End shares simultaneously, through the company's $500 million payment to Sears Holdings funded with proceeds of new indebtedness.  This payment, which occurred immediately before the shares were transferred, reduced the value of the transferees' Lands' End shares dollar for dollar.  As Sears Holdings explained, "Lands' End is also pursuing a Term Loan Facility of approximately $515 million, the proceeds of which we expect will be used to pay a dividend of $500 million to a subsidiary of Sears Holdings immediately prior to the consummation of the spin-off."  Duncan Decl. Ex. 4 (Information Statement) at 52 (Dkt. No. 41-4); Levine Decl. Ex. 7, *Sears I* (Dkt. No. 106-7).   Bank of America made the term loan, and the payment was made.  *See* Press Release, dated April 4, 2014, Duncan Decl., Ex. 5. (Dkt. No. 41-5).

Insider Defendants are aware of none, that holds that a dividend cannot be made "in connection with a securities contract."

Instead, Plaintiffs posit a policy disaster: that the Motion is an "escape hatch" for routine dividends. Pls.' Br. at 20. No such hatch would open. Corporate board resolutions approving cash shareholder dividends would not be safe-harbored by a grant of the Motion. Nor would resolutions authorizing a dividend of stock, absent the qualifying entity and contractual overlay that was present here. This case involves a public contract, containing real gives and gets, among them half a billion new dollars to be paid to the debtor from proceeds borrowed by its counterparty,[3] and securities to be disposed of, some by sale on a public market, others by transfer to holders of public shares. Such arrangements are squarely within section 546(e)'s policy objective to "'promote finality and certainty for investors, by limiting the circumstances . . . under which securities transactions could be unwound,' and 'enhanc[e] the efficiency of securities markets in order to reduce the cost of capital to the American economy." *In re Tribune Co. Fraudulent Conveyance Litig.,* 946 F.3d 66, 92 (2d Cir. 2019) (internal citations omitted); *see also Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12-mc-115 (JSR), 2013 U.S. Dist. LEXIS 56042, at *30-31 (S.D.N.Y. 2013) (The purpose of the safe harbor is to "minimiz[e] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries."). The statute's objective would be met by an early dismissal of these non-insider public shareholders, which would "ensure that honest investors will not be liable if it turns out that a . . . standard business transaction technically rendered a firm insolvent." *Grede v. FCStone, LLC*, 746 F.3d 244, 252 (7th Cir. 2014) (*quoting Peterson v. Somers Dublin Ltd.,* 729 F.3d 741, 748 (7th Cir. 2013)).

---

[3]     *See* n. 2, *supra*.

Plaintiffs turn from their broadside to a series of more modest assaults, each an effort to narrow the "extraordinary breadth"[4] of the "securities contract" definition in section 741(7). They begin by arguing that the Court should not consult U.C.C. and securities law doctrine that extends a contract for the "purchase" of a security beyond a mere sale for cash.[5] Yet the Securities Exchange Act of 1934 guided the Second Circuit's construction of the terms "purchase" and "sale," as used in subsection 741(7)(A)(i). *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F. 3d 411 (2d Cir. 2014). Concluding that these terms encompass *any* other acquisition and disposal of securities, respectively, 773 F.3d at 418, the court stated that they "contemplate[] agreements beyond those for a simple sale or purchase." *Id.* at 420 n. 2; *see also Tribune Co.,* 946 F.3d at 81.[6] *See generally* Defs.' Br. at 11-14.

The debate is academic, as the LE Distribution Agreement calls for the actual sale in the public market of securities – fractional Lands' End Shares – in exchange for cash. *See* Defs.' Br. at 14-15. Plaintiffs ask the Court to ignore this inconvenient aspect of the agreement,[7] their view apparently being that a contract is not a "securities contract" unless it contemplates the cash sale of *a lot of* securities. Finding no help in the text for this idea, Plaintiffs seek refuge in *Merit Mgmt.*

---

[4]      Pls.' Br. at 14.

[5]      Pls.' Br. at 15.

[6]      Courts regularly consult relevant federal, uniform, or state law to interpret Bankruptcy Code provisions implicating that area of law. *See e.g., Holywell Corp. v. Smith*, 503 U.S. 47 (1992) (focusing on Internal Revenue Code provisions to determine whether a liquidating trustee had a duty to file income tax returns and pay income tax); *Board of Governors of the Federal Reserve v. MCorp Financial, Inc.*, 502 U.S. 32 (1991) (referring to the Financial Institutions Supervisory Act to determine whether an administrative enforcement proceeding by the Federal Reserve was enjoined by the automatic stay); *In re Adler, Coleman Clearing Corp.*, 218 B.R. 13, 26 (Bankr. S.D.N.Y. 1998) (referring to the N.Y. U.C.C., where neither the Securities Investors Protection Act (SIPA) nor the Bankruptcy Code provided definitions for an "executory contract").

[7]      *Id.* at 17.

*LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018). But *Merit* construed the "by or to or for the benefit of" phrase, while here the operative phrase is "in connection with a securities contract," and nothing in that phrase or the cases specifies a transaction size, or even requires that disposal of securities be the central feature of the contract.[8]

Plaintiffs next freight the text with another invented requirement: that the transferee be a *party* to a securities contract with the transferor.[9] The text – "in connection with" – contradicts this, as Judge Rakoff has held, writing "[n]owhere in the language of [s]ection 546(e) is such a relationship required." *Sec. Investor Prot. Corp.*, 2013 U.S. Dist. LEXIS 56042, at *45-48 (transfers from debtor to customer "feeder funds" safe-harbored where made in connection with *contracts between the customers and the subsequent transferees*); *see also In re Nine West LBO Sec. Litig.*, 482 F. Supp. 3d 187, 197-98 (S.D.N.Y. 2020) (safe harbor applied to transfer to shareholders pursuant to merger agreement *between debtor's predecessor entity and its acquirer*). Judge Rakoff is not alone. *See Crescent Res. Litig. Tr. ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 476-78 (W.D. Tex. 2013) (transfer to parent company safe-harbored where made in connection with securities contract *between its subsidiary and the debtor*).

Calling for the public sale of some securities for cash, and the disposal of a great many others, the LE Distribution Agreement was certainly a securities contract. The Lands' End Transfers, an integral part of that contract, were made "in connection with" it.

---

[8]    Plaintiffs ask whether fractional shares *actually* were sold, Pls.' Br. at 16 n. 11, but the question is whether there *was* a "securities contract," not whether the contract was performed. Bernard Madoff did not transact in actual securities for his defrauded investors, but the contracts were securities contracts nonetheless. "[W]hether an agreement satisfies the definition of 'securities contract' does not depend on the broker's performance, because [failure to transact] neither changes nor nullifies *the nature of the underlying agreement*." *Madoff*, 773 F.3d at 420 (emphasis added).

[9]    Pls.' Br. at 15-16.

B.    **Sears Holdings was a Qualifying Entity.**

1.    **The Separation and Distribution Agreement is Properly Before the Court.**

The Complaint skates around a key document:  the LE Distribution Agreement.  Having declined to mention it by name in their Complaint, Plaintiffs argue that no one else may, and that instead the Court should review an agreement they supplied by affidavit.  *See* Distribution Agent Agreement, Reding Decl., Ex. A (Dkt. No. 94-1).  Plaintiffs are half right: the Court may – and should – consult both.

Again and again, the Court of Appeals has ruled that plaintiffs cannot avoid Rule 12 review by artful omission.  *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir. 2006) (the judicial notice doctrine "prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting."); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991) (a plaintiff "should not so easily be allowed to escape the consequences of its own failure" to include or reference a crucial document). This rule takes particular force when the documentation of a public transaction is filed with the SEC.  Courts should "take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC," as "no serious question as to their authenticity can exist." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir. 1991) (emphasis added).

"The transfer of the Lands' End shares was approved by and made by Sears Holdings." Complaint ¶ 108.  Indeed it was "approved and made" by means of the LE Distribution Agreement filed with the SEC.  Duncan Decl., Ex. 3 (Dkt. No. 41-3).  On Rule 12 review, "courts must consider the complaint . . . as well as … documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).  To allege that a contractual transfer was "approved and made"

is to incorporate by reference the integrated agreement, filed publicly with the SEC, by which the maker approved it. The document is properly part of the record here.

### 2. The Addition of a Second Agent Does Not Diminish Trust Company's Agency.

The question under section 101(22) is whether Plaintiffs have alleged that the Trust Company was "acting as agent … for a customer … in connection with a securities contract." The LE Distribution Agreement was a Securities Contract, and it calls for a "Distribution Agent" (defined as the Trust Company) to exercise crucial steps as Sears Holdings's agent in effecting the transfers. Duncan Decl., Ex. 3 at 6 (Dkt. No. 41-3) ("'Distribution Agent' means Computershare Trust Company, N.A."). The Distribution Agent Agreement tendered by Plaintiffs in Mr. Reding's declaration is indisputably "in connection with" the LE Distribution Agreement. Plaintiffs do not appear to contest this, arguing instead that because the agreement establishes the agency of both Trust Company and its non-bank affiliate, Computershare, Inc. ("Affiliate"), discovery is warranted to clarify "the duties each Computershare entity performed." Pls.' Br. at 22-23.

No such discovery is necessary, for Mr. Reding's declaration leaves it indisputable that the Trust Company was "acting as agent … for a customer." 11 U.S.C. § 101(22)(A). The Distribution Agent Agreement[10] explicitly assigns to the Trust Company the full scope of that agency. The agreement recites Sears Holdings's "desire[]," as principal, that "the Trust Company and [Affiliate] *act as Distribution Agent* in connection with the Distribution." Reding Decl., Ex. A at 1 (Dkt. No. 94-1) (emphasis added). Section 1 then appoints both the Trust Company and Affiliate as "Distribution Agent." *Id.* Some tasking, primarily involving monetization of the fractional

---

[10] Two days after the Distribution Agent Agreement was signed, when the LE Distribution Agreement was executed and filed with the Securities Exchange Commission, Sears Holdings identified to the market only one Distribution Agent: the Trust Company. LE Distribution Agreement, Duncan Decl., Ex. 3 at 6 (Dkt. No. 41-3).

shares (which Plaintiffs deride as a minor part of the transaction, Pls.' Br. at 16-17), appears to be directed exclusively at the Affiliate.   Other tasks are reserved for the Trust Company, as the agreement recites that "the Trust Company is presently the Transfer Agent and Registrar for [Sears Holdings'] common stock, *id.*, and then contemplates the "Distribution" of Lands' End common shares to "holders of record on the books of the Company's Transfer Agent and Registrar."   In section 3(B), the Distribution Agent is to take action "as Transfer Agent and Registrar" [*i.e.* in a capacity previously ascribed only to the Trust Company].

But most significant for agency purposes is section 7.3.   The Distribution Agent – a definition that includes the Trust Company – broadly indemnifies Sears Holdings, its customer, for *any* breach of the agreement.   Section 7.3 thus makes the Trust Company liable, as agent, for the full scope of the agency.  *See* Restatement (Third) of Agency § 1.04 (2006) ("In a relationship of coagency … [e]ach coagent owes duties to the common principal.").

Section 101(22) does not require that the Trust Company have been its customer's exclusive agent.   Nor does it matter whether it "is acting as agent" by performing tasks itself, or delegating them to others.   The agent retains its responsibility to the principal to the extent of its agreement.  *See, e.g.,* 2A N.Y. Jur. 2D Agency § 174 ("If an agent, having undertaken to do the business of the principal, employs a servant or agent on the agent's own account to assist in what the agent has undertaken, such a subagent is an agent of the agent and is responsible to the agent. The agent is responsible to the principal for the manner in which the business has been done."); *Zurich Gen. Acc. & Liab. Ins. Co. v. Watson Elevator Co.,* 253 N.Y. 404, 408 (1930) (same; applying Massachusetts law).

Courts have rejected attempts to inject limitations into the definition of a qualifying agent. *See, e.g., In re Hechinger Inv. Co.*, 274 B.R. 71, 86-87 (D. Del. 2002) (rejecting an argument that

section 546(e) did not apply where a disbursing agent acted "solely as an intermediary without acquiring any beneficial interest in the shares," and clarifying that "so long as a financial institution is involved, the payment is . . . unavoidable."); *In re SunEdison, Inc.,* 620 B.R. 505 at 511, 514-517 (Bankr. S.D.N.Y. 2020) (rejecting an argument that the safe harbor did not apply because the agent did not facilitate the actual transfer of securities and was involved in only one step of a two-step transfer).

Plaintiffs cite to no decision holding that a financial institution must perform "critical functions" to qualify as an agent, or that a financial institution must be retained as the sole agent in order for the safe harbor to apply to a transaction, *see* Pls.' Br. at 23, but the argument is beside the point, because it is plain from Plaintiffs' proffer that the Trust Company assumed the full scope of the agency. *See Nine West,* 482 F. Supp. 3d at 192, 200-202 (dismissing arguments that the financial institution was a "non-agent contractor" who lacked discretion in the transaction and performed only "ministerial functions," and finding that the transaction was nonetheless safe-harbored). As long as Trust Company was appointed agent of Sears Holdings, doing anything in connection with the securities contract, whether supervisory or hands' on, whether critical or non-critical, invoked the safe harbor.

### C.    Avoidance of the Lands' End Transfers is Barred by the Statute of Limitations.

Plaintiffs do not contest that, *if* New York limitations rules apply, Counts 1 and 2 are time-barred. *See* Pls.' Br. at 3. They argue rather that those counts are saved by the triggering creditor rule. But the rule is a rule of standing, not of limitations: a triggering creditor does not carry a portable statute of limitations except in special circumstances not available to Plaintiffs here. Instead, the choice-of-law rules for determining the applicable statute of limitations follow the *Erie* doctrine, under which the forum state's rules, including its statutes of limitation, generally

apply to all cases except cases arising under federal law.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *In re Coudert Bros. LLP*, 673 F.3d 180, 186-87 (2d Cir. 2012); *In re Gawker Media LLC*, 571 B.R. 612, 626 (Bankr. S.D.N.Y. 2017).  Section 544(b) cases arise under "applicable law," that is, the body of law giving a creditor an avoidance right.  Generally this is non-federal law, and accordingly the forum's rules generally govern.

> **1.      The Seven-Year Statute of Limitations under the Puerto Rico's Internal Revenue Code of 2011 ("<u>Puerto Rico IRC</u>") is Irrelevant.**

Plaintiffs assert in part that applicable law for their section 544(b) claims includes avoidance rights arising under Puerto Rico law.  On that basis they claim the seven-year limitations period under the Puerto Rico IRC.  *See* 13 L.P.R.A. § 30621(a)(1).  Assuming Puerto Rico had a valid unpaid claim in 2014 that remained unpaid on the petition date in 2018, the trustee would have standing to seek to avoid the Lands' End Transfers.  But because the applicable law for that avoidance claim was not federal, the Court would apply New York procedural rules to the claim, and under the analysis set out in the Motion, the applicable limitations period would be four years. *See* Defs.' Br. at 7-9.

> **2.      The Federal Debt Collection Procedures Act ("<u>FDCPA</u>") is Not "Applicable Law" under Section 544(b) of the Bankruptcy Code.**

Plaintiffs also seek to invoke federal avoidance claims, and with them the six-year limitations period under FDCPA codified at 28 U.S.C. § 3306(b)(2).  To be sure, if "applicable law" were federal, the Court would not apply forum choice-of-law rules in derogation of a prescribed federal limitations period.  *See Coudert Bros.*, 673 F.3d at 186-87.  But as the Fifth

Circuit has squarely held, FDCPA is not "applicable law" under section 544(b).  *In re Mirant Corp.*, 675 F.3d 530, 535 (5th Cir. 2012).

When the FDCPA was enacted in 1990, *see* 28 U.S.C. § 3001, *et seq*., what was then section 544(b) of the Bankruptcy Code (now, largely, section 544(b)(1)) was firmly established.   It provided that "[t]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."  11 U.S.C. § 544(b) (Pub. L. 95-598, 92 Stat. 2549 (1978)).  At the same time, section 548 created a *federal* avoidance remedy, *limited in time to two years,* while the only "applicable law" generally available under section 544(b) consisted of domestic or foreign state fraudulent conveyance or fraudulent transfer statutes.  In the United States, these generally called for a four-year limitation period.   Congress was careful not to upset bankruptcy jurisprudence with a uniform reach-back that would have obliterated section 548, and greatly modified the section 544 landscape.  Section 3003(c) of the FDCPA provides that "[t]his chapter shall not be construed to supersede or modify the operation of—(1) title 11."  28 U.S.C. § 3003(c). The "operation of title 11" would, of course, be greatly changed by invoking a new, longer statute in every case that boasts even a single federal claim.  Ruling that this language made clear that FDCPA would not change the operation of limitations periods in bankruptcy, *Mirant Corp.* cited to legislative history noting that FDCPA "would have absolutely no effect on the Bankruptcy Code; *even provisions of the Bankruptcy Code making reference to non-bankruptcy law are to be read as if [FDCPA] did not exist.*" 136 Cong. Rec. H13288 (daily ed. Oct. 27, 1990) (statement of Rep. Jack Brooks) (emphasis added); *see also MC Asset Recovery, LLC* v. *S. Co.,* 2008 WL

11

8832805, at *5 (N.D. Ga. July 7, 2008) ("[T]he FDCPA cannot be the 'applicable law' within the meaning of Section 544(b) of the Bankruptcy Code.").

Some courts have disagreed, including at least one in this district.  *See In re Tronox Inc.,* 503 B.R. 239 (Bankr. S.D.N.Y. 2013).  But the Fifth Circuit's is the better view.  Deeming the FDCPA applicable law, and construing it as these plaintiffs do (*but see* Discussion, *infra* §3), would effectively impose a blanket six-year limitations period, for it is hard to find a case of any size without some federal creditor.  It would render section 548's express two-year period for a federal avoidance right a nullity, and contradict Congressional intent, as set out in the statute and the legislative history.  It would also grant to the great run of commercial creditors a windfall that they would not enjoy outside of bankruptcy.  An unpaid federal claim of $100 may rejuvenate $100 million in avoidance claims of commercial creditors that, but for bankruptcy, would have lapsed.  *See New York v. Mountain Tobacco Co.*, 942 F.3d 536, 547 (2d Cir. 2019) ("A statute should be interpreted in a way that avoids absurd results.").  This case well illustrates the problem. Public shareholders transacted in 2014 under a fully-disclosed public arrangement, and now find plaintiffs seeking to upend settled securities transactions six years later.  The Court should rule that the Trustee cannot invoke FDCPA to avoid the usual procedural rules that apply here.

> **3.    Even if the FDCPA is "Applicable Law" under Section 544(b) of the Bankruptcy Code, the Pension Benefit Guaranty Corporation ("PBGC") and the Occupational Safety and Health Administration ("OSHA") Do Not Qualify as Triggering Creditors.**

Even if FDCPA were "applicable law" under section 544(b), Counts 1 and 2 would be untimely, for Plaintiffs have failed to identify a federal triggering creditor that might have avoided the Lands' End Transfers.  "[I]n order to establish standing under Section 544(b) . . . a trustee must first identify a creditor as to whom the transfer could have been avoided . . . *at the time of the fraudulent transfer.*"  *In re Allou Distribs., Inc.,* 392 B.R. 24, 31 (Bankr. E.D.N.Y. 2008) (emphasis

added).  Here, the creditor's standing to avoid a transfer must have existed as of April 2014, the

transfer date, *see* Complaint ¶ 6, and its status as a creditor must have persisted until the Petition

Date.

Plaintiffs rest on FDCPA, for only under FDCPA might they lay claim to a six-year statute.

Section 3304 of FDCPA grants to the United States an avoidance remedy for transfers deemed

fraudulent "as to a debt to the United States *which arises before the transfer is made . . . .*"  28

U.S.C. § 3304 (emphasis added).  Section 3002(3) defines "debt," in pertinent part, as

> *[A]n amount that is owing to the United States* on account of a fee,
> duty, lease, rent, service, sale of real or personal property,
> overpayment, fine, assessment, penalty, restitution, damages,
> interest, tax, bail bond forfeiture, reimbursement, recovery of a cost
> incurred by the United States, or other source of indebtedness to the
> United States …

28 U.S.C. § 3002(3)(B) (emphasis added).  Thus, in order to access FDCPA for purposes of

avoiding a transfer, the United States must hold a "debt" – an amount actually owing to it – as of

April 2014, the time of the Lands' End Transfers.[11]

The PBGC's proofs of claim allege that certain pension insurance premiums, unfunded

benefit liabilities, and minimum funding contributions began to accrue *when the Debtors

terminated their pension plans on January 31, 2019.  See* PBGC's Proofs of Claim Nos. 14597,

14683, 14741, 14861 and 14925.  These claims were not "debts," as defined in FDCPA, in 2014.

At that time, the PBGC would have had no power under FDCPA to avoid any transfer.

---

[11]    In this respect, FDCPA differs from the Uniform Fraudulent Transfer Acts common in the
states, in which "creditors" with standing to avoid a transfer include those holding unmatured or contingent
claims.  *See, e.g.*, 6 Del. C. §§ 1301(3), (4) and 1307 (Delaware Uniform Fraudulent Transfer Act, granting
avoidance remedies to "creditors," defined to include those holding "contingent" and "unmatured" claims.).
By contrast, the United States has no standing to avoid a transfer under section 3304 of FDCPA, until that
claim has matured into an amount that is actually "owing."

In a footnote, Plaintiffs refer to OSHA as another potential federal creditor.[12]  The OSHA

proofs of claim present the same problem.  They allege that violations of the Occupational Safety

and Health Act took place in or about June 2018.  *See* OSHA's Proof of Claim No. 20569

(amending OSHA's Proof of Claim No. 20167); OSHA's Proof of Claim No. 20599 (amending

OSHA's Proof of Claim No. 20165).  These claims were not "debts," as defined in FDCPA, that

had arisen as of 2014, and thus OSHA cannot be a triggering creditor under FDCPA either.

## II.    Seritage Transfers.

Like Plaintiffs, Movants have relied on the briefing in *Sears I* with regard to Seritage,

except for a point that turns on the arguments above. The Seritage Subscription Agreement was

itself an additional securities contract in connection with which the alleged transfers were made.

*See* Defs.' Br. at 20-21.

The Seritage agency question follows a pattern similar to that discussed above for Lands'

End.  In public filings with the SEC, Sears Holdings identified the Trust Company as the only

"subscription agent for the rights offering" and as the "transfer agent and registrar for the common

shares . . . of Seritage Growth."  Prospectus of Seritage Growth Properties, dated June 9, 2015

Duncan Decl., Ex. 7 at 12, 30, 147 (Dkt. No. 41-7).  It described the Trust Company's "sole

discretion" to determine the oversubscription allocation, and describes in detail its duties,

including the receipt of the payments, the holding of funds in escrow, and the sending of

certificates to registered holders.  *See id.* at 15, 18-19, 21.  A separate "Subscription Agent

Agreement" appoints both the Trust Company and a non-banking affiliate as the "Agent."  Duncan

Decl., Ex. 8 at § 1.1 (Dkt. No. 41-8).  That agreement makes the "Agent" – defined to include the

Trust Company – liable to Sears Holdings for *all* losses arising from "failure to comply with the

---

[12]    Pls.' Br. at 6 n. 8.

terms of this Agreement." *Id*. § 11.4.  It sets out joint obligations and joint fees throughout, and is executed on behalf of both Computershare entities comprising the "Agent." *Id.* at 15.  Thus, with regards to the Seritage transfers as well, the Trust Company assumed the full scope of, and liability associated with the agency.  It makes no difference whether it acted as agent directly, acted together with a co-agent, or acted by delegating to a sub-agent.

[*Remainder of page intentionally left blank*]

15

## CONCLUSION

For the foregoing reasons, and those set out in the Non-Insider Defendants' Opening Brief, the Court should dismiss the Complaint with prejudice, and grant such other and further relief as the Court deems just and proper.

Dated: New York, NY  
      March 5, 2021

MORGAN, LEWIS & BOCKIUS LLP

By:        */s/ Sabin Willett*

Sabin Willett, Esq. *(pro hac vice)*  
Julia Frost-Davies, Esq. *(pro hac vice)*  
Nathaniel P. Bruhn, Esq. *(pro hac vice)*  
Morgan, Lewis & Bockius LLP  
One Federal Street  
Boston, Massachusetts 02110-1726  
Telephone:    (617) 341-7700  
Facsimile:    (617) 341-7701  
Emails: sabin.willett@morganlewis.com  
      julia.frost-davies@morganlewis.com  
      nathaniel.bruhn@morganlewis.com

– and –

Melissa Y. Boey, Esq.  
David K. Shim, Esq.  
Nakisha Duncan, Esq.  
Morgan, Lewis & Bockius LLP  
101 Park Avenue  
New York, NY 10178-0060  
Telephone:    (212) 309-6000  
Facsimile:    (212) 309-6001  
Emails: melissa.boey@morganlewis.com  
      david.shim@morganlewis.com  
      nakisha.duncan@morganlewis.com

*Counsel to the Non-Insider Defendants*

**CERTIFICATE OF SERVICE**

I, Melissa Y. Boey, hereby certify that on this 5th day of March 4, 2021, a copy of this *Reply in Support of the Non-Insider Defendants' Motion to Dismiss the Complaint* was filed electronically with the Clerk of Court through the Court's CM/ECF system, thus electronically serving all registered parties.

_____*/s/ Melissa Y. Boey*_____
Melissa Y. Boey